COLDWELL BANKER RESIDENTIAL
REAL ESTATE SERVICES, INC.,
Plaintiff-Respondent/Cross-Appellant,

v.

MISSOURI REAL ESTATE COMMIS-
SION,
Defendant-Appellant/Cross-Respondent.

No. 67204.

Supreme Court of Missouri,
En Banc.

June 17, 1986.

Rehearing Denied July 15, 1986.

William L. Webster, Atty. Gen., Richard Baugh, Asst. Atty. Gen., Jefferson City, for defendant-appellant.

Laurence R. Tucker, Kansas City, for plaintiff-respondent.

BLACKMAR, Judge.

The plaintiff-respondent, Coldwell, is a real estate broker licensed in Missouri. It is a wholly-owned subsidiary of Sears, Roebuck & Co., (Sears), the well-known national merchandising chain.

In 1982 Coldwell developed a promotional sales program known as the "Sears Home Buyer's Savings Program" (Savings Program). Home buyers who purchase a home through Coldwell receive, after the closing of the transaction, a booklet of coupons entitling them to discounts on certain merchandise and services available at Sears. Coldwell advertises the availability of the program through radio and television shots, print advertising, mailings, telephone calls and window displays.

The coupon books are given only to home buyers who actually purchase homes through Coldwell. This circumstance raises a problem under § 339.100.2(12), RSMo 1978, reading as follows: (Emphasis supplied)

2. The commission may cause a complaint to be filed with the administrative hearing commission as provided by law when the commission believes there is a probability that a licensee has performed or attempted to perform any of the following acts:

\* \* \* \* \* \*

(12) *Using* prizes, money, gifts or other valuable consideration *as inducement* to secure customers to purchase, lease, sell or list property when the awarding of such prizes, money, gifts or other valuable consideration is *conditioned* upon the purchase, lease, sale or listing; or soliciting, selling or offering for sale real property by offering free lots, or conducting lotteries or contests, or offering prizes for the purpose of influencing a purchaser or prospective purchaser of real property.

The appellant Commission adopted a regulation, 4 C.S.R. 250–8.070(5)(b), designed to implement the statute, in the following terms: (Emphasis supplied)

(5)(b) Conditional inducements. No licensee shall *use* prizes, money, gifts or other valuable consideration which is *not related* to the real or personal property being sold or which is not an inherent part of the finances of the transaction itself *as inducements* to secure customers to purchase, lease, sell or list property when the awarding of such items *is conditioned* upon the purchase, lease, sale or listing. This prohibition shall apply to the use of any such item as an inducement even if the item is being provided or paid for by another.

Coldwell brought an action for declaratory judgment against the Commission, arguing as follows: (1) the statute and regulation do not prohibit the Savings Program; (2) the statute and regulation violate the due process clauses of the Fourteenth Amendment to the Constitution of the United States and Article I, Sec. 10 of the Missouri Constitution; (3) the statute and regulation deprive the plaintiff of the equal protection of the laws, in violation of the

Fourteenth Amendment and Article I, Sec. 2 of the Missouri Constitution; and (4) the statute and the regulation infringe Coldwell's right to free speech under the First Amendment and Article I, Sec. 8, of the Missouri Constitution. It sought injunctive relief against the enforcement of the statute and the regulation.

■ Both parties moved for summary judgment. The trial court found that the statute and regulation violated the due process clauses and entered an injunction against enforcement. The court rejected Coldwell's other claims. The Commission appealed from the injunctive order. Coldwell filed a purported cross appeal[1] because of the rejection of its equal protection and freedom of expression claims, but does not now argue that the program does not violate the statute. We reverse and remand with directions.[2]

## I.

■ The trial court improperly applied the due process clauses in holding the statute to be unconstitutional. The apparent purpose of the statute is to foreclose one method of competition to real estate brokers. Freedom of competition is the normal rule of our economy, but it is not a constitutional imperative. Legislation which substantially restricts competition, has been frequently upheld. The milk[3] and liquor[4] industries come readily to mind. The statute appears to have been adopted as a means of preserving the traditional methods of carrying on the real estate brokerage business. We know judicially that real estate brokers are normally retained and compensated by sellers. The essential function of the broker is to locate buyers. The legislature might feel that the broker who provided inducements contingent on purchasing could obtain undue advantage over fellow brokers in attracting purchasers, not related to efficiency of service rendered. This advantage arguably might drive the smaller and weaker brokers out of business, so as to operate as a long term detriment to the housing market. We do not have to agree as to this projection of possible effects of the legislation if they represent conclusions the legislature might possibly draw. It is not for us to determine whether the enactment is wise or not. We are obliged to sustain legislation which is utterly foolish, absent a valid constitutional challenge.

■ The power of our General Assembly is plenary.[5] It is not necessary to point to a specific constitutional provision in order to sustain a statute. There was a time when the Supreme Court of the United States struck down economic regulations with some regularity as violative of due process,[6] but that day is past.[7] The broadest recent claim as to the extent of substantive due process is found in the concurring opinion of Justice Harlan in *Griswold v. Connecticut*, 381 U.S. 479, 499, 85 S.Ct. 1678, 1689, 14 L.Ed.2d 510 (1965) in which

---

1. The cross appeal is not technically necessary. Coldwell, as the prevailing party, is entitled to advance any argument here in support of the judgment.

2. The case comes to the writer on recent reassignment.

3. Unfair Milk Sales Practices Act, §§ 416.410–416.555, RSMo 1978 and Supp.1984. *Borden Company v. Thomason*, 353 S.W.2d 735 (Mo. banc 1962). Section 416.440, RSMo 1978 severely limits the ability of milk producers and distributors to give rebates or discounts. *See also Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934).

4. Sections 311.332–311.338, RSMo 1978 (restricting discounts and rebates that can be offered by liquor wholesalers). *See Wine and Spirits Speciality Inc. v. Daniel*, 666 S.W.2d 416 (Mo. banc 1984). *Cf. Milgram Food Stores v. Ketchum*, 384 S.W.2d 510 (Mo.1964).

5. *Penner v. King*, 695 S.W.2d 887 (Mo. banc 1985); *State v. Holekamp Lumber Co.*, 340 S.W.2d 678 (Mo. banc 1960).

6. *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), is often cited as the horrible example of the old era. *See also New State Ice Co. v. Lichmann*, 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747 (1932).

7. *Friedman v. Rogers*, 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979); *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

he says that the test is whether the statute "violates basic values 'implicit in the concept of ordered liberty.' " [8] The statute before us shows no such vice.

■ Coldwell cites some of our decisions in an attempt to demonstrate that economic regulation is subject to rather close scrutiny and that the proponents of legislation must convince the courts that the regulation is reasonable and arguably effective. The cases do not support the conclusion sought to be drawn. The statute does not prevent Coldwell from conducting a business. It simply regulates the method. The real estate business may be regulated substantially.[9]

Coldwell strongly emphasizes *State ex rel. Kansas City v. Public Service Commission*, 524 S.W.2d 855 (Mo. banc 1975), which reversed a holding that Kansas City must share the cost of the repair of railroad viaducts. That case did not involve the issues present here. Coldwell does not cite any recent case in which economic regulation has been struck down on due process grounds.[10] Substantive due process under our Constitution is no more restrictive on the legislature than the theory of substantive due process currently espoused by the United States Supreme Court, when economic regulation is in issue.[11] Any broader holding would invite the courts to substitute their views of the wisdom of legislation for those of the General Assembly.

The proper extent of judicial review of legislation under the due process clause was described by then Justice Stone in *United States v. Carolene Products Co.*,

304 U.S. 144, 152, 58 S.Ct. 778, 783, 82 L.Ed. 1234 (1938), as follows:

[T]he existence of facts supporting the legislative judgment is to be presumed, for regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators. ...

In a later phase of the same case, *Carolene Products Co. v. United States*, 323 U.S. 18, 31, 65 S.Ct. 1, 8, 89 L.Ed. 15 (1944), the Court spoke through Justice Reed in this way:

When Congress exercises a delegated power such as that over interstate commerce, the methods which it employs to carry out its purposes are beyond attack without a clear and convincing showing that there is no rational basis for the legislation; that it is an arbitrary fiat. ...

■ The statute is not shown to be invalid on due process grounds.

## II.

We agree with the trial judge on the points raised in Coldwell's cross appeal.

■ The equal protection contention is not substantial. The legislature may regulate the real estate industry without imposing similar regulations on other industries, or other kinds of brokers.[12] No substantial authority supports a contrary view.

**8.** The quoted matter is from Justice Cardozo's opinion in *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937).

**9.** *Miller Nationwide Real Estate Corporation v. Sikeston Motel Corporation,* 418 S.W.2d 173 (Mo.1967); *see also Boyle v. Missouri Real Estate Commission,* 537 S.W.2d 603 (Mo.App.1976).

**10.** Coldwell cites *ABC Liquidators, Inc. v. Kansas City,* 322 S.W.2d 876 (Mo.1959) (regarding a Kansas City ordinance which prohibited auctions on Sunday) and *Poole & Creber Market Co. v. Breshears,* 125 S.W.2d 23 (Mo.1938) (regarding a statute disallowing the sale of milk or milk

derivatives if oil or fat had been added). In both cases, the statutes were upheld. Similarly, our more recent decision in *Missouri Dental Board v. Alexander,* 628 S.W.2d 646 (Mo. banc 1982) upheld an economic regulation against a due process challenge.

**11.** *Missouri v. Day-Brite Lighting, Inc.,* 362 Mo. 299, 240 S.W.2d 886 (Mo.1951), *aff'd,* 342 U.S. 421, 72 S.Ct. 674, 96 L.Ed. 1334 (1952).

**12.** *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 489,

Coldwell argues, essentially, that any "inducement" to do business is protected commercial speech, so that regulation must conform to the four-part test of *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). This argument fails to distinguish between the inducement itself and the communication of the inducement. The statute says that things of value shall not be given to attract purchasers. It does not deal with the means of communication, and would apply even if there were no advertising and Coldwell relied purely on customers who had received the benefit to spread the word. The statute regulates conduct, not speech.

The dissent argues that our construction of the statute as just advanced is not warranted by the language, and that the savings program is contrary to law only if advertised. We disagree. We are obliged to resolve doubts in favor of the constitutionality of legislation and to construe a statute so as to uphold its validity, unless such a construction is foreclosed by plain language. We reject the construction advanced in the dissent. *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), strongly relied on by the dissent, and holding that the legislature may not forbid the advertising of a lawful business, is not in point. The statute before us proscribes the use of coupons as inducement, however accomplished. In this challenge to the facial constitutionality, it is not appropriate to discuss problems of proof in the factual variations which may be presented.

Commercial speech is protected only if it deals with lawful activity. *Bates v.*

*State Bar of Arizona*, 433 U.S. 350, 384, 97 S.Ct. 2691, 2709, 53 L.Ed.2d 810 (1977); *Central Hudson Gas v. Public Service Commission, supra* at 564. If the discount program is contrary to law the plaintiff has no greater right to advertise it than to advertise a chicken fight or a house of prostitution.

Coldwell cites *Terry v. California State Board of Pharmacy*, 395 F.Supp. 94 (N.D. Cal.1975), *affirmed without opinion*, 426 U.S. 913, 96 S.Ct. 2617, 49 L.Ed.2d 368 (1976), in which a three-judge court held that a prohibition on advertising the prices of health care services, including prescription drugs, and of the fact that certain drugs were sold at a "discount", violated First Amendment rights. The court pointed to a state decision holding that the statute did not prohibit the giving of discounts, but only the representation that the price was a discount price. The case is unlike this one because the statute there involved regulated speech, not conduct.[13]

The case of *Coldwell Banker Res. Real Estate v. Clayton*, 105 Ill.2d 389 86 Ill.Dec. 322, 475 N.E.2d 536 (1985), is substantially identical on the facts, but that court fails to distinguish between regulation of conduct and regulation of expression. The court undertook an analysis of the statute under the *Central Hudson* test, which is inappropriate and unnecessary in a case involving economic regulation.[14]

Of interest is *Eaton v. Supreme Court of Arkansas*, 270 Ark. 573, 607 S.W.2d 55 (1980), *cert. den.*, 450 U.S. 966, 101 S.Ct. 1483, 67 L.Ed.2d 615 (1981), in which a lawyer placed an advertisement in a book of discount coupons, offering a "discount" on legal services. The case arose following

---

75 S.Ct. 461, 465, 99 L.Ed. 563 (1955); *Collins v. Director of Revenue*, 691 S.W.2d 246 (Mo. banc 1985).

**13.** The statute in question was substantially the same as the statute held unconstitutional in *Virginia Pharmacy Board v. Virginia Citizens Consumer Counsel*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), one of the first "commercial speech" cases.

**14.** Coldwell calls our attention to the approval of the Illinois decision in *Graben v. Alabama Real Estate Commission*, Civil Action 86–T–69–N, (M.D.Ala. March 31, 1986). This case involved a consent decree in which the Attorney General expressed his agreement with the Illinois decision. *See also Coldwell Banker Residential Real Estate Services of Ohio, Inc., v. Bishop*, No. C–840601 (Ohio Ct.App. Sept. 4, 1985) (finding that the conduct did not violate the statute in question).

*Bates v. State Bar of Arizona, supra,* and at a time when the Supreme Court of the United States was vigilant in the protection of lawyers' commercial speech. *In re R.M.J.,* 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982). The Supreme Court of Arkansas held, however, that the lawyer was subject to discipline, and certiorari was denied. We may infer that the Court was willing to allow the regulation of a particular method of marketing legal services, and that the advertising of this method of marketing was not protected commercial speech.

*City of Los Angeles v. Preferred Communications, Inc.,* —— U.S. ——, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986), cited in the dissent, is not remotely in point. The question in that case was whether lawful, protected, non-commercial speech (cable television) could be restricted in the interest of minimizing demands for the use of public property such as utility poles and rights of way. The Court held, in line with its past decisions, that the city had a burden in justifying the restrictions. Here the advertising of the savings program does not constitute protected speech unless the program itself is lawful.

 Economic regulations, otherwise valid, are not rendered invalid simply because availability of the prohibited activity must be communicated to serve its purpose.

The record before us shows that the plaintiff, as a matter of law, is not entitled to the relief sought. Coldwell states in its brief that there are no remaining factual issues. The injunctive decree is reversed and the case is remanded with directions to enter judgment for the defendant.

HIGGINS, C.J., BILLINGS and REND-LEN, JJ., and CLARK, Special Judge, concur.

DONNELLY, J., concurs in separate opinion filed.

WELLIVER, J., dissents in separate opinion filed.

ROBERTSON, J., not sitting.

DONNELLY, Judge, concurring.

In *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Supreme Court of the United States outlawed racial segregation in the public schools of the states.

In *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), against a backdrop of overwhelming acceptance of *Brown,* the United States Supreme Court asserted for the first time in its history and in the history of the nation that *its interpretations* of the written Constitution constitute the "supreme law of the land" under Article VI of the Constitution and are of binding effect on the states.

In *Cooper,* the Court enabled itself to "work out principles of legality, equality, and the rest, revise these principles from time to time in the light of what seems to the Court fresh moral insight, and judge the acts of Congress, the states, and the President accordingly." R. Dworkin, *Taking Rights Seriously* 137 (1977). This is unfortunate.[1]

In my view, the opinion in *Brown* drew its "inspiration from consecrated principles." B. Cardozo, *The Nature of the Judicial Process* (1921). It has already secured its place in history by virtue of its declaration for decency and justice. But it is a tragedy of our time that *Brown* was not treated as a necessary and enlightened, *but unique,* deviation from constitutional judicial process. The books are full of the fruits of the immoderate *Cooper* assertion. Pertinent here is the treatment given commercial speech.

Prior to 1975, commercial speech was not protected by the First Amendment. *Valentine v. Chrestensen,* 316 U.S. 52, 62

---

1. With the possibility of Reagan appointments to the Court now looming on the horizon, the elites are beginning to take another look at the *Cooper* assertion. *If* a significant change in personnel should occur, we could see a return to Original Intent. Or, a new Court could embrace the *Cooper* arrogation and proceed to implant predilections of its own.

S.Ct. 920, 86 L.Ed. 1262 (1942). In *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), the Court rejected *Chrestensen* and held that the right to advertise a New York abortion clinic in Virginia is protected by the First Amendment. *Bigelow* may have been "an attempt to buttress" the decision in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), where the Court *created* a constitutional right to obtain an abortion. *See* R. Schiro, *Commercial Speech: The Demise of a Chimera*, 1976 Sup.Ct.Rev. 45, 78. In any event, in *Bigelow* the Court opened the door to transformation of First Amendment free speech from Holmes' "marketplace of ideas" concept to protection of business advertising.

In my view, the justices have acted unwisely. They have trivialized the free speech guarantee of the First Amendment. More important, *without saying so*, they have returned to subjective *ad hoc* substantive due process behind the facade of free speech. "One might have thought, as the Court has so often proclaimed, that demanding judicial review of economic legislation was a concern of the past. Even if that tradition were to be revived, we would expect to find the constitutional safeguards of economic liberty to be housed within the flexible contours of due process of law. Instead, economic due process is resurrected, clothed in the ill-fitting garb of the first amendment, and sent forth to battle the kind of special interest legislation that the Court has tolerated for more than forty years. In short, the Supreme Court has reconstituted the values of *Lochner v. New York* [198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937] as components of freedom of speech." Jackson & Jeffries, *Commercial Speech: Economic Due Process and the First Amendment*, 65 Va.L.Rev. 1, 30–31 (1979).

In such circumstance, I am delighted to join my brothers in rejecting a holding which "would invite the courts [of Missouri] to substitute their views of the wisdom of legislation for those of the General Assembly." It will be a great day for the nation when the Supreme Court of the United States returns "to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws." *Ferguson v. Skrupa*, 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963).

I concur.

WELLIVER, Judge, dissenting.

I respectfully dissent.

After attaching the label of "economic regulation"[1] to the statute at issue, the principal opinion improperly disregards United States Supreme Court interpretation of the First Amendment to the United States Constitution. Whether or not state court judges agree with that Court's decisions we must accept and follow Supreme Court pronouncements on federal constitutional law. *See Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1816). *See also* The Federalist Papers No. 82. *See generally* G. Gunther, Constitutional Law 36–48 (10th ed. 1980); Hart and Wechsler's The Federal Courts And The Federal System 455–60 (2nd ed. 1973). Our federal system does not contemplate state courts avoiding the dictates of applicable federal law by attaching a label to a statute or by torturing the construction and interpretation of statutes in order to reach an "adequate and independent" state ground on which to base the decision. *See Michigan v. Long*, 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983). *Cf. Murdock v. City of Memphis*, 87 U.S. (20 Wall.) 590, 22 L.Ed. 590 (1875). I would

---

**1.** All commercial speech cases would fall under the label of economic regulation simply because such activity proposes a business transaction—that is, economic activity. It is apparently for this reason that some commentators criticize trivializing the First Amendment by including commercial speech under its protection in a fashion reminiscent of *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). *See* Jackson & Jeffries, Commercial Speech: Economic Due Process and the First Amendment, 65 Va.L.Rev. 1 (1979). *See also* L. Tribe, Constitutional Choices 210 (1985).

join the State of Alabama in following the well reasoned and amply supported opinion of the Illinois Supreme Court and hold the regulation unconstitutional.

"First Amendment theory provides different levels of protection by balancing the competing interests depending on the character of the speech. The highest protection is accorded pure speech touching on matters of public importance." *Henry v. Halliburton*, 690 S.W.2d 775, 784 (Mo. banc 1985). *See generally Philadelphia Newspapers, Inc. v. Hepps*, — U.S. —, —––––, 106 S.Ct. 1558, 1562–64, 89 L.Ed.2d 783, 54 U.S.L.W. 4373, 4375–76 (U.S. April 22, 1986); *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, — U.S. —, —, 106 S.Ct. 903, 906, 89 L.Ed.2d 1 (1986); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, — U.S. —, 105 S.Ct. 2939, 2945 n. 5, 86 L.Ed.2d 598 (1985); *F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 104 S.Ct. 3106, 3118, 82 L.Ed.2d 278 (1984); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982). Such protection reflects that "debate on public issues should be uninhibited, robust, and wide-open." *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). Initially, the Supreme Court held that commercial speech was not entitled to such First Amendment protection. *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942). Later, in *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), and in *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct.

1817, 48 L.Ed.2d 346 (1976), the Court rejected its earlier position and brought commercial speech within the sphere of the First Amendment. Although not entitled to the same level of protection, it is now settled that regulations of commercial speech will be scrutinized to ensure their constitutionality. *See generally* Barnes, A Call For a Value-Based Test of Commercial Speech, 63 Wash. U.L.Q. 649 (1985); Barnes, Regulations of Speech Intended to Affect Behavior, 63 Denver U.L.Rev. 37 (1985); McChesney, Commercial Speech in the Professions: The Supreme Court's Unanswered Questions and Questionable Answers, 134 U.Pa.L.Rev. 45 (1985); Shiffrin, The First Amendment and Economic Regulation: Away from a General Theory of the First Amendment, 78 New.U.L.Rev. 1212 (1983).

The initial question is whether the *activity* being regulated is speech. Coldwell argues that the statute and regulation are unconstitutional restraints on its right to solicit business through the use of a type of promotional program. According to Coldwell, the restriction prohibits it from *using* the promotional program to attract customers, which Coldwell contends is a regulation on its right to solicit and thus advertise. The principal opinion responds by presuming that the State has prohibited the underlying commercial activity—that is, the giving of the coupons—and holds that speech is not involved. If the underlying activity, in fact, was prohibited, we may well have a different case.[2] The restriction in this case cannot be so easily separated into activity versus speech because the restriction is aimed at a form of

---

**2.** Due to the widespread use of coupons as an indirect means for reducing consumer prices and generating business, it may well be that a flat prohibition on discount coupons would come perilously close to offending the Fourteenth Amendment. *See e.g.,* Airline Plans Giveaways To Spur Atlantic Travel, St. Louis Post-Dispatch, May 21, 1986, at 1 (Rolls Royce, townhouses, and other gifts to stimulate travel). The argument can be made that a reduced price is an important factor in a consumer's decision and the State cannot presume that the consumer will be harmed, or overwhelmed, by that factor alone in the decision-making process. *See gen-*

*erally* Scott, Error and Rationality in Individual Decisionmaking: An Essay on the Relationship Between Cognitive Illusions and the Management of Choices, 59 S.Cal.L.Rev. 329 (1986). One might draw an analogy between this regulation and a restriction on using lower prices as inducement to secure business for the licensee.

The principal opinion refers to other areas where competition is restricted. The two statutes cited are concerned with price discrimination and driving out competitors. That, however, is a far cry from the purported reason for the statute at issue and what it regulates.

solicitation through advertising where speech will always be a component part.

When the Supreme Court held that commercial speech was entitled to First Amendment protection—albeit to a lesser degree of protection than "political" speech, it did not design for us an exact measuring stick or formula for measuring and distinguishing what is commercial activity and what is commercial speech. In *Friedman v. Rogers*, 440 U.S. 1, 10 n. 9, 99 S.Ct. 887, 894 n. 9, 59 L.Ed.2d 100 (1979), that Court noted:

> The application of First Amendment protection to speech that does "no more than propose a commercial transaction," *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 385 [93 S.Ct. 2553, 2558, 37 L.Ed.2d 669] (1973), has been recognized generally as a substantial extension of traditional free-speech doctrine which poses special problems not presented by other forms of protected speech. Jackson & Jeffries, Commercial Speech: Economic Due Process and the First Amendment, 65 Va.L. Rev. 1 (1979); Note, 57 B.U.L.Rev. 833 (1977). *Cf.* Comment, First Amendment Protection for Commercial Advertising: The New Constitutional Doctrine, 44 U.Chi.L.Rev. 205 (1976). By definition, commercial speech is linked inextricably to commercial activity: while the First Amendment affords such speech "a limited measure of protection," it is also true that "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456 [98 S.Ct. 1912, 1918, 56 L.Ed.2d 444] (1978). Because of the special character of commercial speech and the relative novelty of First Amendment protection for such speech, we act with caution in confronting First Amendment challenges to economic legislation that serves legitimate regulatory interests. Our decisions dealing with more traditional First Amendment problems do not extend automatically to this as yet uncharted area. See, e.g., id., at 462 n. 20 [98 S.Ct. at 1922 n. 20] (overbreadth analysis not applicable to commercial speech). When dealing with restrictions on commercial speech we frame our decisions narrowly, "allowing modes of regulation [of commercial speech] that might be impermissible in the realm of noncommercial expression." Id., at 456 [98 S.Ct. at 1918].

Commenting upon the case, Archibald Cox writes that it may well be futile to attempt "to maintain a general constitutional distinction between commercial advertising and other commercial activity." A. Cox, Freedom of Expression 40 (1981). *See also* Jackson v. Jeffries, Commercial Speech: Economic Due Process and the First Amendment, 65 V.L.Rev. 1, 21 n. 70, 32–34 (1979). This may be true, but until the commercial speech doctrine is overturned by the Supreme Court of the United States, it is our duty to undertake the task.

This case illustrates the difficulty in distinguishing between commercial speech and other forms of commercial activity. The principal opinion avoids the problem by holding that the statute prohibits the giving of the coupons as gifts to those who purchase real estate through Coldwell. The opinion draws a distinction between the inducement itself and the communication of the inducement. It states that "[t]he statute says that things of value shall not be given to attract purchasers. It does not deal with the means of communication, and would apply even if there were not advertising and Coldwell relied purely on customers who had received the benefit to spread the word. The statute regulates conduct, not speech." The analysis, logical as it appears to be, overlooks both the *terms* of the statute and the difficult question of distinguishing between conduct and speech.

The principal opinion not only misreads the statute but ignores the Commission's own argument to this Court. The crux of the statute is that it prohibits the Savings Program *only* if Coldwell *uses* the Program to *induce* customers to purchase, lease, sell or list property. The statute is not a *per se* prohibition against the Savings

Program; rather, it is directed at the *manner* and *purpose* for implementing such a program.[3] It is undisputed in the record that the Commission is arguing that Coldwell cannot use the program if it intends to *use* the coupons to *induce* customers. The Commission's brief before this Court focuses on whether the Program will, in fact, induce customers; and, the Commission's initial position was that the trial court had insufficient facts to render any decision in a motion for summary judgment. In their reply brief, the Commission makes its position clear when it observes:

> [A]ssuming *arguendo* that the program does not influence consumers, the program would not be within the bounds of the statute. To prove a violation under § 339.100.2(12), RSMo 1978, the Commission would have to prove that a licensee used the coupons and that a consumer's decision to list or sell through that licensee was influenced by those coupons. * * * Respondent could institute its program and *only those licensees actually using the coupons to influence consumer decisions could be disciplined.*
>
> * * * It is clear that consumer influence is what this case is all about.

(Emphasis added.) Elsewhere, the Commission concedes that to establish a violation of the statute the Commission must do more than,

> enter into evidence an advertisement that the coupons will be given to a customer. The *Commission would have to prove that the licensee actually and knowingly used the coupons to induce the customer in a specific transaction* and that the customer was actually influenced by the licensee's conduct, i.e., use of the discount coupon book. Prosecution could not occur if a buyer of a home was unaffected by the licensee's use of the coupons.

(Emphasis added.) In oral argument to this Court, the Commission was asked whether the statute prohibited the *giving* of the coupons if Coldwell did not advertise, and the Commission failed to answer the question. Thus, it seems clear to all but the majority of the Court that the statute would not be violated if the licensee gave the coupons not for the purpose of inducing the customer to purchase, lease, sell or list property but rather for such a purpose as generating more business for Sears by offering coupons.

That the statute was intended to regulate the *manner* in which the licensee proposes a commercial transaction was virtually admitted by the Commission in its Suggestions in Opposition to Plaintiff's Motion for Summary Judgment. The Commission's own regulation confirms this point by providing that the regulation restricts the *manner* of advertising.

> PURPOSE: This rule not only defines advertising but it also regulates the manner, form, requirements and restrictions imposed thereon....

4 C.S.R. 250–8.070.

Quite clearly, therefore, the statute at issue attempts to regulate the manner licensees can solicit business through advertising. Such regulations have been treated consistently as implicating commercial speech. For example, in *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), the managing editor of a newspaper was charged with violating the prohibition against encouraging or prompting the procurement of abortions. Under the reasoning of the principal opinion, one could argue that this was a regulation of activity and not speech because there is a difference between the encouragement itself and the advertising. But of course no such distinction was drawn in *Bigelow.* Similarly, in *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), the State sought to restrict a particular form of lawyer solicitation. Although the Court up-

---

**3.** The principal opinion presumes that conditional gifts are tantamount to "inducement[s]" under the statute and therefore prohibited. A reading of the statute indicates the fallacy in this reasoning. Using something as an induce-ment under the statute refers to the manner of behavior (soliciting or advertising) and is not synonymous with the reference to conditional gifts.

held the restriction against in-person solicitation, it was presumed that the activity being regulated involved some element of commercial speech. In the case at bar, however, the principal opinion suggests that the activity in *Ohralik* did not involve speech simply because there is a difference between the manner of acquiring clients and the transmission of information concerning the services to be rendered to the client.[4] While critical of the commercial speech cases, Jackson & Jeffries indicate that prohibiting the inducement or encouragement of commercial activity without prohibiting the activity absent such inducement or encouragement implicates commercial speech concerns:

**4.** Certain language in *Ohralik*, however, does, at first glance, seem to support such a distinction: Moreover, "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502 [69 S.Ct. 684, 690, 93 L.Ed. 834] (1949). Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities, *SEC v. Texas Gulf Sulfer Co.,* 401 F.2d 833 (CA2 1968), *cert. denied,* 394 U.S. 976 [89 S.Ct. 1454, 22 L.Ed.2d 756] (1969), corporate proxy statements, *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375 [90 S.Ct. 616, 24 L.Ed.2d 593] (1970), the exchange of price and production information among competitors, *American Column & Lumber Co. v. United States,* 257 U.S. 377 [42 S.Ct. 114, 66 L.Ed. 284] (1921), and employers' threats of retaliation for the labor activities of employees, *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 618 [89 S.Ct. 1918, 1942, 23 L.Ed.2d 547] (1969). *See Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 61–62 [93 S.Ct. 2628, 2637, 37 L.Ed.2d 446] (1973). Each of these examples illustrates that the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity. Neither *Virginia Pharmacy* nor *Bates* purported to cast doubt on the permissibility of these kinds of commercial regulation.

In-person solicitation by a lawyer of remunerative employment is a business transaction in which speech is an essential but subordinate component.
*Ohralik v. Ohio State Bar Ass'n, supra,* 436 U.S. at 456–47, 98 S.Ct. 1918–19. *See also Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Rela-*

A number of states, for example, have statutes that regulate or prohibit the use of "loss leaders"—the practice of selling certain products at below cost to "lead" consumers into a store, where they presumably will buy other products as well. The Supreme Court has upheld these regulations. *See Safeway Stores, Inc. v. Oklahoma Retail Grocers Ass'n,* 360 U.S. 334, 341–42 [79 S.Ct. 1196, 1201–02, 3 L.Ed.2d 1280] (1959). If, however, states wished for some reason to ban the advertising of loss leaders but not the selling below cost (*because, for example, they were more concerned with the solicitation aspect than the below cost selling* aspect, and thought that this

*tions,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). And, in *SEC v. Lowe,* 725 F.2d 892, 901 (2nd Cir.1984), later reversed on other grounds in —— U.S. ——, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985), the Second Circuit held that the activity in that case was simply the regulation of economic activity—although the court then considered the restriction in light of the commercial speech doctrine. *But cf.* Schoeman, The First Amendment and Restriction on Advertising of Securities Under the Securities Act of 1933, 41 The Bus. Lawyer 377 (1986). Predicting the full import of this language in *Ohralik* is difficult for a number of reasons. First, the Court in that case had not yet developed a less restrictive test for commercial speech and was attempting to explain that certain economic activity that involved speech could be regulated. Second, in *Friedman v. Rogers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979), the Court noted that commercial activity and commercial speech often might be inextricably linked. And, third, since *Ohralik,* the Court has treated nontraditional advertising cases as commercial speech, and now under *Central Hudson Gas and Electric v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), there is a workable approach for determining the constitutionality of such regulations.

In a well-written article, one commentator suggests that the Supreme Court has treated commercial advertising cases differently than nonadvertising cases, although the latter still fall within the realm of commercial speech. McChesney, *supra.* While the author criticizes such a distinction, he contends that in nonadvertising cases such as *Ohralik* and *Friedman,* the State need only show a risk of deception. It is important to note, however, that such cases are treated as commercial speech cases. While I believe that *Central Hudson* resolved this problem, even under this less restrictive test the statute at issue is unconstitutional.

would be easier to police than an "intent" test), application of the decision in *Virginia Board of Pharmacy* would lead to the conclusion that the advertising ban without an underlying product ban runs afoul of the first amendment.

Jackson & Jeffries, *supra*, at 36 n. 128 (emphasis added).[5] That is what the State has done in the case *sub judice*. It was concerned with the solicitation aspect of using the discount coupons (not unlike "loss leaders") to attract customers and only regulated that activity without prohibiting discount coupons. *See also* A. Cox, *supra*, at 41 (suggesting that a restriction against encouraging the consumption of cigarettes or alcoholic beverages would be unconstitutional).[6]

When confronted with the Savings Program and a similar prohibition, both the Illinois Supreme Court and the State of Alabama agree that the activity being regulated is commercial speech. *See Coldwell Banker Res. Real Estate v. Clayton,* 105 Ill.2d 389, 86 Ill.Dec. 322, 475 N.E.2d 536 (1985); *Coldwell Banker Graben Real Estate v. Alabama Real Estate Comm'n,* No. 86–T–69–N, Consent Decree, March 31, 1986 (U.S.D. Ct. M.D.Ala.). *See also Coldwell Banker Res. Real Estate Services of Ohio v. Bishop,* No. C–840601 slip op. (Ohio Ct. of App. Sept. 4, 1985) (per curiam) (suggesting such activity involves commercial speech). *See generally* D. Burke, Law of Real Estate Brokers § 5.12 (1985 Supp.) (for a discussion of the Illinois case). This conclusion is inescapable because Coldwell is prohibited only from *using* the coupon books as *inducements* when one purchases, leases, or lists real estate with Coldwell. The Savings Program is *not* in itself made unlawful; it is only when it is used to *induce* customers that it becomes unlawful. Thus, "inducement," in this context, is but a substitute for prohibiting the communication of the Savings Program—that is, advertising of the Savings Program. "[I]t

---

5. The authors, however, suggest that such a situation illustrates the problem with commercial speech cases because the distinction should be pointless and the activity should be subject to state regulation. The import of the distinction, however, is lessened because under *Central Hudson* the State can regulate some commercial speech.

6. The principal opinion seems to disregard other Supreme Court decisions where that Court could have distinguished between commercial activity and commercial speech (advertising) but failed to entertain such an analysis. *See Bolger v. Youngs Drugs Product Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (a prohibition on unsolicited mailing of contraceptive advertisements); *Central Hudson Gas and Electric v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (a prohibition against private utility companies from promoting energy consumption); *Friedman v. Rogers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979) (restricting the use of trade names for optometrists). *See also City of Renton v. Playtime Theatres, Inc.,* — U.S. ——, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (zoning ordinance restricting the location of adult movie theatres); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) ("anti-skid row" ordinance). And, I see no reason why, under the reasoning of the principal opinion, a court could not hold that a prohibition against in-person distribution of commercial information is a regulation of commercial activity and not speech (advertising). *E.g., Valentine v. Chrestensen,* 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942). *But cf. Ad World, Inc. v. Township of Doylestown,* 672 F.2d 1136 (3rd Cir.1982).

If, for example, the state prohibited the sale of liquor, it could prohibit the advertising. If, however, the sale of liquor was not prohibited but strictly regulated through time, place and manner restrictions, and one of the regulations prohibited encouraging the sale of liquor, the principal opinion suggests that such a regulation would be directed at activity rather than speech. Advertising could be viewed as an incident to the sale of liquor, and the prohibition would be against the manner of soliciting business. *E.g., Delamater v. South Dakota,* 205 U.S. 93, 104, 27 S.Ct. 447, 450, 51 L.Ed. 724 (1907). *See also* Barnes, Regulations of Speech Intended to Affect Behavior, *supra,* at 43. Although subsequently affirmed on other grounds, a United States Court of Appeals presumed that commercial speech was involved when the State of Oklahoma strictly regulated the sale of liquor but prohibited its advertising. *Oklahoma Telecasters Ass'n v. Crisp,* 699 F.2d 490 (10th Cir.1983), *aff'd on other grounds, Capital Cities Cable, Inc., v. Crisp,* 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984). *See also Spiritual Psychic Science Church of Azusa,* 39 Cal.3d 501, 703, 217 Cal. Rptr. 225, 703 P.2d 1119 (Cal.1985) (although deciding the issue on state grounds, held that a regulation against fortunetellers was directed at speech).

is only the *communication*—the use of the plans as inducements to secure customers, with a direct tie to a transaction—which the defendant claims is illegal. The information sought to be communicated concerns a lawful activity." *Coldwell Banker Res. Real Estate v. Clayton, supra,* 475 N.E.2d at 542. The Illinois court, therefore, observed that such a prohibition "is, in effect, an advertising regulation. Commercial speech concerns are . . . directly at issue." *Id.* at 540. In a consent decree, the Attorney General for the State of Alabama conceded that this type of prohibition was aimed at commercial speech and was unconstitutional. *Coldwell Banker Graben Real Estate v. Alabama Real Estate Comm'n, supra.*

Having determined that the State is attempting to regulate commercial speech, I would then decide whether the regulation is constitutional under the four-part test established in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

> (1) The First Amendment protects commercial speech only if that speech concerns lawful activity and is not misleading. A restriction on otherwise protected commercial speech is valid only if it (2) seeks to implement a substantial governmental interest, (3) directly advances that interest, and (4) reaches no further than necessary to accomplish the given objective.

*Metromedia, Inc. v. San Diego,* 453 U.S. 490, 507, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (summarizing the *Central Hudson* test). As discussed earlier, the giving of the coupon books is not illegal; thus, advertising the Savings Program is not advertising unlawful activity. "[T]here is nothing inherently unlawful in . . . the coupon program . . ." *Coldwell Banker Res. Real Estate v. Clayton, supra,* 475 N.E.2d at 542. The State, in effect, is permitting a discount on the fees but denying the servicer the ability to inform the customer about the discount.

The Commission claims that advertising about the availability of the Savings Program will mislead the public because the information disseminated by the advertisements, although truthful, will be misused by consumers. It is not the advertisements that the Commission claims will mislead consumers; rather, the Commission contends that when consumers are informed about the Savings Program they may become unduly enticed by the Program and engage Coldwell's services for a reason other than Coldwell's competence as a real estate broker. Such a paternalistic justification has been rejected consistently by the United States Supreme Court. *See Bates v. State Bar of Arizona,* 433 U.S. 350, 365, 97 S.Ct. 2691, 2699, 53 L.Ed.2d 810 (1977); *Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85, 96–97, 97 S.Ct. 1614, 1620, 52 L.Ed.2d 155 (1977); *Virginia Pharmacy Board v. Virginia Pharmacy Council,* 425 U.S. 748, 770, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1976).

> What is at issue is whether a State may completely suppress the dissemination of concededly truthful information about an entirely lawful activity, fearful of the information's effect upon its disseminators and its recipients. Reserving other questions, we conclude that the answer to this one is in the negative.

*Virginia Pharmacy Board v. Virginia Pharmacy Council, supra,* at 773, 96 S.Ct. at 1831. Truthful commercial speech that is misleading may be banned only if the *form* of the speech is more likely to deceive the public than to inform the public. *Central Hudson Gas v. Public Service Comm'n, supra,* 447 U.S. at 563, 100 S.Ct. at 2350.

A review of the Savings Program indicates that there is nothing misleading in the Savings Program itself or in telling consumers about the existence of the Savings Program. Similarly, the Illinois court observed:

> The defendant maintains that the section's prohibition of plaintiff's marketing plans, as well as the use of a "limitless array of gimmicks," prevents the distortion of the cost of the broker's services

or the home he is attempting to sell. As such, the consumer is better able to make informed price and quality comparisons. Defendant goes so far as to suggest that brokers could use such inducements to lead buyers to specific neighborhoods or homes. Defendant concludes that the section "serves as a means of unfairly victimizing the public in the sophisticated financial transaction of the sale of property."

Defendant's bare assertions are conjectural and insufficient to justify the restrictions the section places on commercial speech. No evidence has been presented which would demonstrate that the use of commission discounts or discount coupons is inherently harmful or dishonest or likely to confuse or mislead the consumer.

*Coldwell Banker Res. Real Estate v. Clayton, supra,* 475 N.E.2d at 543.

Regulation of commercial speech will be upheld if it is proportionate to the interest served, directly advances that governmental interest and is no "more extensive than necessary to serve that interest." *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 2881, 77 L.Ed.2d 469 (1983). *See In re R.M.J.,* 455 U.S. 191, 203, 102 S.Ct. 929, 931, 71 L.Ed.2d 64 (1982). The burden is on the State to justify a restriction on commercial speech. *Zauderer v. The Office of Disciplinary Counsel,* — U.S. —, —, 105 S.Ct. 2265, 2276, 85 L.Ed.2d 652, 666 (1985); *Bolger v. Youngs Drug Products Corp., supra.* The Commission argues that the prohibition in this case protects the public from information which may distract prospective customers from more important considerations regarding the purchase of a home.

I agree with the Illinois Supreme Court and the Attorney General for Alabama that such an argument carries little weight. *Cf. Linmark Associates, Inc. v. Willingboro, supra,* 431 U.S. at 96–97, 97 S.Ct. at 1620; Rotunda, The Commercial Speech Doctrine In the Supreme Court U.Ill.L.F. 1080 (1976). In striking down a state ban on drug price advertising, the United States Supreme Court stated:

There is ... an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them.... But the choice among these alternative approaches is not ours to make or the Virginia General Assembly's. It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us.

*Virginia Pharmacy Board v. Virginia Pharmacy Council, supra,* 425 U.S. at 770, 96 S.Ct. at 1829.

The majority, admitting that *Coldwell Banker v. Clayton, supra,* "is substantially identical on the facts," would dispose of and decline to follow the case for the reason that the Illinois Court "fails to distinguish between regulation of conduct and regulation of expression." However, between circulation of the principal opinion and final draft of this dissent, a unanimous U.S. Supreme Court speaking through Justice Rehnquist has stated:

Moreover, where speech and conduct are joined in a single course of action, the First Amendment values must be balanced against competing societal interests.

....

Where a law is subjected to a colorable First Amendment challenge, the rule of rationality which will sustain legislation against other constitutional challenges typically does not have the same controlling force. But cf. *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 459 [98 S.Ct. 1912, 1920, 56 L.Ed.2d 444 (1978). This Court "may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgement of expressive activity."

*City of Los Angeles v. Preferred Communications, Inc.,* —— U.S. ——, ——, 106 S.Ct. 2034, ——, 90 L.Ed.2d 480 (1986) (citations omitted).

Additionally, restrictions upon protected commercial speech must be narrowly drawn and may extend only as far as the interest it serves. *Central Hudson Gas & Electric Corp. v. Public Service Comm'n, supra,* 447 U.S. at 565, 100 S.Ct. at 2350. Like our sister court in Illinois, I agree that "[i]f a broker does, however, utilize a marketing plan to defraud or mislead a consumer," other options are available to the State. *Coldwell Banker Res. Real Estate v. Clayton, supra,* 475 N.E.2d at 543. The Commission, for example, can proceed against a licensee who performs "[a]ny other conduct which constitutes untrustworthy, improper or fraudulent business dealings, or demonstrates bad faith or gross incompetence." § 339.100.2(18), RSMo 1978. The statute and regulation at issue prohibit an entire category of commercial speech while more limited means exist for effectuating the asserted governmental purpose.[7] *See* In re R.M.J., *supra,* at 203, 102 S.Ct. at 931.

I would affirm the judgment.[8]

---

7. Our recent decisions involving commercial speech have been grounded in the faith that the free flow of commercial information is valuable enough to justify imposing on would be regulators the costs of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful.
 *Zauderer v. Office of Disciplinary Counsel, supra,* —— U.S. at —— 105 S.Ct. at 2279, 85 L.Ed.2d at 669.

8. For several years, I taught thousands of Missouri licensees in a real estate association pre-licensing school that statutes and regulations such as those currently before this Court are constitutional. That, however, was before the

United States Supreme Court's recognition of the applicability of the commercial speech doctrine and before the creation of national real estate companies such as Coldwell Banker, Century 21 and others. The buying and selling of real estate and the use of coupons each touch the life of almost every person living in the United States. I now perceive it to be my duty to determine the constitutionality of the regulation at issue in light of the recent Supreme Court decisions, and after doing so I must agree with the decision of the Illinois Supreme Court that the regulation is unconstitutional. I might also add that as an instructor in the real estate pre-licensing school, I was issued a broker's license which has never been activated.