886 F.2d 986
 RICO Bus.Disp.Guide 7304
 ATLAS PILE DRIVING CO. and Olson Concrete Co., both
Minnesota corporations, Appellees,
v.
DiCON FINANCIAL CO., a Minnesota limited partnership, Lake
Minnetonka Homes, Inc., a Minnesota business
corporation, and Richard Conry, Appellants.
DiCON FINANCIAL CO., Lake Minnetonka Homes, Inc., Richard Conry,
v.
ATLAS PILE DRIVING CO., Olson Concrete Company, Koenig,
Robin, Johnson & Wood, William R. Koenig, James G.
Robin, Peter W. Johnson and John W. Wood, Jr.
Curtis ANDERSON,
v.
ATLAS PILE DRIVING CO., Olson Concrete Company, Koenig,
Robin, Johnson & Wood, William R. Koenig, James G.
Robin, Peter W. Johnson & John W. Wood, Jr.
ATLAS PILE DRIVING CO., and Olson Concrete Company, Appellees,
v.
DiCON FINANCIAL CO., Lake Minnetonka Homes, Inc., and
Richard Conry, Appellants.
 Nos. 88-5170, 88-5434.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 8, 1989.
Decided Sept. 14, 1989.
 
 Paul Enge, Minneapolis, Minn., for appellants.
 Peter W. Johnson, Wayzata, Minn., for appellees.
 Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and BEAM, Circuit Judge.
 BEAM, Circuit Judge.
 
 
 1
 Richard Conry, DiCon Financial Company, and Lake Minnetonka Homes, Inc., hereinafter collectively referred to as the appellants, appeal from the district court's[1] entry of judgment on the jury verdict and the denial of their motion for judgment n.o.v. or, in the alternative, a new trial. 697 F.Supp. 1058. Atlas Pile Driving Company (Atlas) and Olson Concrete Company (Olson) alleged that the appellants defrauded them in connection with subcontracting work they performed on a residence and that the fraud constituted a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Secs. 1961-1968. We affirm.
 
 I. BACKGROUND
 
 2
 In this case, two subcontractors claim that two individuals and the companies they formed engaged in a scheme to defraud residential housing subcontractors. The subcontractors allege that the seller of land, the lender, and the general contractor devised a scheme whereby the general contractor falsely promised payment for work completed on residential housing projects, the lender foreclosed its prior lien on the property, and the misled subcontractors were unable to collect from the general contractor or obtain relief against the value of the property.
 
 
 3
 Richard Conry is the sole owner of Lake Minnetonka Homes, Inc. (LMH), a real estate development corporation conducting business as a general contractor which deals in residential construction projects. Conry also owns and controls American Engineering Services (AES), a company which performs the carpentry subcontracting on residences constructed by LMH. Occasionally, AES provided carpentry work on residences built by other general contractors. LMH is a general partner of DiCon Financial Company (DiCon), owning 99.9 percent of DiCon. DiCon is engaged in the business of making loans to companies which develop real property. Curtis Anderson was an employee of AES, working full-time as an onsite carpentry supervisor. Anderson owned and controlled Curtis Anderson Construction Company, Inc. (CACC) and Stroth Construction Company, Inc. (Stroth). Anderson formed the corporations to purchase real estate and to act as general contractors in building single-family homes on the purchased real estate.
 
 
 4
 Conry decided to develop a portion of his family's land in 1981. This subdivision was to be known as Countryside Manor (Countryside). In September 1982, Anderson, on behalf of the newly-formed CACC, purchased three Countryside lots from LMH for $120,000. To finance the purchase and development of the lots, Anderson obtained a loan of $420,000 from DiCon in exchange for mortgages on the properties. DiCon funded the land purchase of $120,000 and borrowed $300,000 from B.T. Investors for the construction financing on the lots. DiCon then assigned the mortgages to B.T. Investors. B.T. Investors in turn assigned the mortgages to First National Bank of St. Paul which advanced $300,000 to B.T. Investors.
 
 
 5
 Anderson testified that he invested around $20,000 of his own money in CACC and outside investors provided additional capital of $27,000. Anderson estimated that his construction costs for the Countryside lots would be $1,066,000. Construction on the lots was commenced in September 1982 and completed in August 1983. Anderson promised the subcontractors that they would be paid soon after the completion of their work. However, a number of subcontractors were never paid or were paid amounts only sufficient to ensure that they would finish their work. Since a number of subcontractors were not paid by CACC, they filed mechanics' liens on all three properties. In contrast, AES was paid over $166,000, the full amount due it, for the carpentry work it furnished on the three Countryside residences.
 
 
 6
 Following default on the loans by Anderson, DiCon initiated foreclosure proceedings. At the three foreclosure sales, DiCon bid the amount of its encumbrance[2] on each property as follows: (1) $161,232 on the first property; (2) $166,480 on the second property; and (3) $199,836 on the third property. During the redemption period, some of the subcontractors joined together and exercised their right of redemption. One lot was redeemed for $183,000 and the other for $200,000. The remaining property was sold by DiCon for $185,000.
 
 
 7
 In May 1983, Anderson, on behalf of Stroth, purchased an undeveloped lot in the St. Alban's Green (St. Alban's) subdivision from LMH for $210,000. The parties to this action dispute the value of the St. Alban's property, and Atlas's and Olson's expert testified that the fair market value of the lot was $71,000. The financing arrangement was quite similar to the method utilized to finance the Countryside lots. Anderson financed the purchase and development of the lot by securing a loan of $350,000 from DiCon. According to Robert Harding, a certified public accountant, the loan agreement provided for an annual interest rate of 31.08 percent. DiCon funded the purchase of the lot, and B.T. Investors provided construction financing in the amount of $140,000. DiCon assigned the mortgage to B.T. Investors which then assigned it to First National Bank of St. Paul.
 
 
 8
 Due to delays in securing a design for the home and other problems, construction at the St. Alban's property did not begin until March 1984. The St. Alban's land was marshy. So, Atlas built pilings and installed a specialized foundation for the proposed residence. Olson constructed the concrete foundation for the home. Atlas's bill for the work it completed amounted to $24,935, and Olson charged $25,522.33 for the foundation. Neither subcontractor has ever been paid for the work completed at St. Alban's. Atlas and Olson were not alone in their collection problems. Like the situation at Countryside, a number of other subcontractors at St. Alban's were not paid or received only partial payment and filed mechanics' liens. Likewise, AES was paid $78,000 for the carpentry work it completed on the residence.
 
 
 9
 When Stroth defaulted on its loan for the St. Alban's project, DiCon again commenced foreclosure proceedings. DiCon bid $430,000 at the foreclosure sale, and no one redeemed. At the time of trial, the home had not yet been sold.
 
 
 10
 Alleging that there was a scheme to defraud subcontractors who provided labor and materials for the projects at Countryside and St. Alban's, Atlas and Olson filed this action, claiming commonlaw fraud and violations of RICO and the Minnesota Fraudulent Conveyances Act. The court dismissed the claims grounded on common-law fraud and the Fraudulent Conveyances Act. The jury returned a verdict for Atlas and Olson, finding that the appellants violated 18 U.S.C. Sec. 1962(a), (c), and (d) (1982). The court, pursuant to RICO, assessed treble damages in excess of $150,000 and awarded attorney's fees of over $50,000. The court denied the appellants' timely motion for judgment n.o.v. or, in the alternative, a new trial.
 
 
 11
 On appeal, the appellants argue that the judgment n.o.v. should have been granted because Atlas and Olson did not demonstrate that racketeering activity was present, that a pattern of such activity existed, that there was an enterprise distinct from the person alleged to have violated RICO, that there existed an enterprise distinct from the pattern of racketeering activity, and that their damages were caused by RICO violations. The appellants next argue that the motion, in the alternative, for a new trial should have been granted because the evidence was insufficient to show that Conry conspired to violate RICO and because of numerous discovery violations. Finally, the appellants assert that attorney's fees should not have been awarded.
 
 II. DISCUSSION
 
 12
 A. Judgment n.o.v.
 
 1. Standard of Review
 
 13
 In determining whether to grant a judgment n.o.v., both the trial court and this court must consider the evidence in the light most favorable to the prevailing party, assume that the jury resolved all conflicts of evidence in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts, and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence. Northside Mercury Sales & Serv., Inc. v. Ford Motor Co., 871 F.2d 758, 760 (8th Cir.1989) (citations omitted).
 
 2. Introduction to RICO
 
 14
 The major purpose behind RICO is to curb the infiltration of legitimate business organizations by racketeers. United States v. Turkette, 452 U.S. 576, 591, 101 S.Ct. 2524, 2532-33, 69 L.Ed.2d 246 (1981). Although the initial aim may have been to thwart organized crime, RICO also imposes civil liability on other types of organizations. See Bennett v. Berg, 685 F.2d 1053, 1063 (8th Cir.1982) (determining that RICO suits are not limited to contexts in which ties to organized crime are alleged), rev'd in part on other grounds, 710 F.2d 1361 (8th Cir.) (en banc), cert. denied, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). "Any person injured in his business or property by reason of a violation of section 1962 * * * shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. Sec. 1964(c) (1982). "It shall be unlawful for any person who has received any income * * * from a pattern of racketeering activity * * * to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, * * * in [the] * * * operation of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. Sec. 1962(a) (1982). Subsection (c) makes it "unlawful for any person * * * associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to * * * participate, directly or indirectly, in * * * such enterprise's affairs through a pattern of racketeering activity * * *." 18 U.S.C. Sec. 1962(c) (1982). It is also "unlawful for any person to conspire to violate * * * subsection (a), (b), or (c) of [section 1962]." 18 U.S.C. Sec. 1962(d) (1982) (amended by Pub.L. 100-690, Title VII Sec. 7033, 102 Stat. 4398 (1988)). A "pattern of racketeering activity" is defined as "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years * * *." 18 U.S.C. Sec. 1961(5) (1982). "Racketeering activity" includes acts indictable under specified federal statutes. 18 U.S.C. Sec. 1961(1)(B) (1982 & Supp. V 1987). Section 1961(4) states that an " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. Sec. 1961(4) (1982). Although the jury grounded liability on both subsections (a) and (c) of section 1962, we first analyze this case under section 1962(c) because we find that subsection more applicable to the facts of the case. Thus, a plaintiff in establishing a RICO case under section 1962(c) must demonstrate (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (footnote omitted).
 
 3. Racketeering Activity
 
 15
 As indicated, to prevail under RICO, a plaintiff must demonstrate that a defendant committed acts of racketeering activity, also known as predicate offenses. Here, Atlas and Olson alleged that the appellants engaged in mail fraud, 18 U.S.C. Sec. 1341 (1982),[3] which is one of the predicate offenses listed in section 1961(1)(B). Specifically, Atlas and Olson asserted that the acts of mailing the foreclosure notices to them brought the appellants within the purview of section 1341. Because the appellants did not directly communicate with Atlas or Olson and because Atlas and Olson failed to show that representations made by Anderson could be attributed to the appellants under a conspiracy theory, the district court dismissed Atlas's and Olson's state fraudulent misrepresentation claim. The appellants first contend that because the district court dismissed the common-law claim of fraud, Atlas and Olson can no longer prove mail fraud, as mail fraud claims are based upon a showing of common-law fraud. However, mail fraud requires a different showing of proof.
 
 
 16
 To prevail on a common-law fraud claim in Minnesota, the plaintiff must prove, among other matters,[4] that a representation was made. In contrast, no misrepresentation of fact is required in order to establish mail fraud. United States v. McNeive, 536 F.2d 1245, 1249 n. 10 (8th Cir.1976) (citation omitted); United States v. Sylvanus, 192 F.2d 96, 106 (7th Cir.1951) (citations omitted), cert. denied, 342 U.S. 943, 72 S.Ct. 555, 96 L.Ed. 701 (1952). Furthermore, the Supreme Court, in Durland v. United States, 161 U.S. 306, 312-14, 16 S.Ct. 508, 510-11, 40 L.Ed. 709 (1896), determined that the reach of mail fraud is broader than the concept of common-law fraud. Thus, we conclude that proof of mail fraud is not dependent on a showing of common-law fraud under Minnesota law.
 
 
 17
 Appellants additionally argue that the evidence was insufficient to show that they committed mail fraud. To establish mail fraud, the plaintiff must show the existence of a plan or scheme to defraud, that it was foreseeable that the defendant's scheme would cause the mails to be used, and that the use of the mails was for the purpose of carrying out the fraudulent scheme. United States v. Leyden, 842 F.2d 1026, 1028 (8th Cir.1988). We first consider whether there was a scheme to defraud.
 
 
 18
 "[T]he term 'scheme to defraud' connotes some degree of planning by the perpetrator, [and] it is essential that the evidence show the defendant entertained an intent to defraud." McNeive, 536 F.2d at 1247 (citation omitted). Schemes using deceptive practices to induce the unwary to give up money or some other tangible property interest are within the scope of section 1341. Id. at 1248. The crime of mail fraud is broad in scope and its fraudulent aspect is measured by a nontechnical standard, condemning conduct which fails to conform to standards of moral uprightness, fundamental honesty, and fair play. United States v. Bishop, 825 F.2d 1278, 1280 (8th Cir.1987) (citation omitted).
 
 
 19
 Here, no one fact in isolation demonstrates that there was a scheme to defraud. Rather, when the facts are viewed in their entirety and inferences are made therefrom, a scheme to defraud emerges. LMH sold each Countryside lot and DiCon acted as the lender, filing its mortgage before work began on the properties. CACC had capital in the amount of approximately $347,000 ($100,000 construction financing for each lot plus the investment by Anderson and others), yet the company's expenses were calculated by Anderson to be over three times that amount. Despite the obvious lack of funds, CACC promised payment thirty days after the work was completed or at the rough-in stage.[5] AES was paid $166,471 for the work it completed on the Countryside lots. This amount was in excess of the market rate for carpentry work according to Atlas's and Olson's carpentry experts. In contrast, only minor, insubstantial amounts were paid to the other subcontractors who provided work or materials for the Countryside lots. Lyman Lumber Company was also paid in full, but Lyman Lumber Company had a longstanding, close relationship with Conry and LMH. Although a number of mechanics' liens were filed, the liens were subordinate to DiCon's mortgage which was filed before construction commenced. After CACC failed to repay the loan from DiCon, DiCon foreclosed on the three Countryside properties. Through foreclosure proceedings, DiCon was able to bar the mechanics' liens because its mortgage had priority. It was also impractical for the subcontractors to proceed against CACC since CACC lacked the funds to satisfy a judgment. Thus, DiCon, LMH, AES, and Conry profited from the construction of the Countryside lots at the expense of the subcontractors. History repeated itself at St. Alban's.
 
 
 20
 The procedure followed on the St. Alban's project was almost identical to the arrangement used to develop the Countryside lots. However, Stroth was the builder, instead of CACC, and a new group of subcontractors, who were not aware of the problems with the Countryside project were retained. Additionally, the lot was overvalued at St. Alban's, making redemption by the subcontractors highly unlikely.[6] Once again, LMH sold the lot and DiCon filed a mortgage prior to the commencement of construction; the builder was undercapitalized yet assured payment to subcontractors; AES was overcompensated for its work; the other subcontractors, except for Lyman Lumber Company which was paid in full, received a fraction of the amount due; the property was foreclosed on by DiCon; the subcontractors were unable to proceed against the property or Stroth; and Conry, AES, LMH, and DiCon profited while the subcontractors received a pittance. Moreover, the record is replete with misrepresentations made by Conry which belie his claims of blamelessness.
 
 
 21
 Gary Vinge, an excavating subcontractor on the St. Alban's project, testified that Conry was introduced to him as a city or village inspector and that Conry imparted to him that Conry's mother was the lender. Anderson listed AES and DiCon as credit references on his applications for credit with several subcontractors. These subcontractors then contacted AES or DiCon and were informed by Conry or others that Anderson was not a credit risk. Conry told Stuart Zell, who was a supplier of a lumber for the St. Alban's property, that the property had been sold. In fact, the house was a "spec" house, meaning that a buyer had not been secured prior to the beginning of construction. Conry informed Thomas Chouinard, a plumbing and heating subcontractor, that Conry was backing the Countryside project and that Conry would ensure that Chouinard would be paid. Likewise, Conry assured Bradley Langerman, who provided roofing for the St. Alban's house, that Langerman would be paid. From the foregoing evidence, the jury could infer that a scheme was devised under which the subcontractors would be defrauded of their labor or materials with no recourse and Conry and his companies would thereby have the benefit of the subcontractors' services and materials without paying for them.
 
 
 22
 With respect to the second element, we think it was foreseeable that the mails would be used. As will be shown, a foreclosure sale was necessary in order to effectuate the scheme. Therefore, it was almost certain that notice of these proceedings would be mailed to other claimants or that notice would be published in newspapers and copies of the notice distributed through the mails, see Minn.Stat.Ann. Secs. 580.03, 580.031 (West 1988).
 
 
 23
 In determining whether the use of the mails was for the purpose of carrying out a fraudulent scheme, this court has stated that "a mailing may be a 'routine' mailing or even one that is sent for a 'legitimate business purpose' so long as it assists * * * in carrying out the fraud." Leyden, 842 F.2d at 1028 (quoting United States v. Freitag, 768 F.2d 240, 244 (8th Cir.1985)). Foreclosure was an essential element in the scheme since this proceeding was the means by which Conry and his companies could acquire the material and services of the subcontractors without providing compensation in return. For instance, if Conry had been the builder and failed to make payment, the subcontractors would have enjoyed superior rights in the property with respect to Conry. However, if someone else (a "strawman" here), developed the property and Conry loaned the money, he could acquire a mortgage superior to the subsequent mechanics' liens. Even though the subcontractors possessed mechanics' liens, once Conry foreclosed through DiCon, the liens would be essentially worthless and Conry would have obtained the value of their work without payment. Adding the last link to this chain, Minnesota law requires that notice be given in order to foreclose on real estate. See Minn.Stat.Ann. Secs. 580.03, 580.031 (West 1988). Thus, the mailing of the notice assisted in perpetration of the fraud.
 
 
 24
 The elements of mail fraud were demonstrated here. Because a showing of common-law fraud was unnecessary, we conclude that Atlas and Olson adequately proved that Conry, LMH, and DiCon engaged in racketeering activity.
 
 4. Pattern of Racketeering Activity
 
 25
 In Sedima, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14, the Supreme Court interpreted the RICO pattern requirement, stating:
 
 
 26
 As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in Sec. 1961 in that it states that a pattern "requires at least two acts of racketeering activity," Sec. 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. * * * It is this factor of continuity plus relationship which combines to produce a pattern." S. Rep. No. 91-617, p. 158 (1969) (emphasis added). * * * Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."
 
 
 27
 Following Sedima, this court held in Superior Oil Co. v. Fulmer, 785 F.2d 252, 257 (8th Cir.1986), that something more than a single scheme is required in order to establish a pattern of racketeering activity. Accordingly, the rule in this circuit has been that several acts in furtherance of a single scheme will not satisfy the pattern requirement; plaintiffs must show multiple schemes. See, e.g., H.J., Inc. v. Northwestern Bell Tel. Co., 829 F.2d 648, 649-50 (8th Cir.1987) (holding that several acts over a six-year period to influence the Minnesota Public Utilities Commission, the regulatory body responsible for determining the rate Northwestern Bell could charge, constituted a single scheme), rev'd, --- U.S. ----, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); Ornest v. Delaware North Cos., 818 F.2d 651, 652 (8th Cir.1987) (determining that "skimming" money from the gross receipts of vending machine sales over an eight-year period did not satisfy the multiple scheme requirement). The appellants argue that Atlas and Olson have failed to prove two illegal schemes. They contend that Atlas and Olson have only demonstrated, at best, one ongoing scheme over several years to defraud residential housing subcontractors. However, the Supreme Court has recently spoken on this issue, rejecting this court's interpretation of the pattern requirement.
 
 
 28
 In H.J., Inc. v. Northwestern Bell Tel. Co., --- U.S. ----, ----, 109 S.Ct. 2893, 2897-99, 106 L.Ed.2d 195 (1989), the Court found no support for the proposition "that predicate acts of racketeering may form a pattern only when they are part of separate illegal schemes." Instead, the Court held that, in order to prove a pattern of racketeering activity, "a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." Id. --- U.S. at ----, 109 S.Ct. at 2900 (emphasis in original). Providing guidance on the relationship element, the Court stated that "conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id. (citation omitted). The concept of continuity is more difficult to define and the Court declined to formulate a general test, "adopt[ing] a less inflexible approach." Id. --- U.S. at ----, 109 S.Ct. at 2901.
 
 
 29
 "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept * * *. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.
 
 
 30
 Id. (citation omitted). With these principles in mind, we conclude, after closely examining the record that Atlas and Olson have shown that the appellants' activities manifested both relationship and continuity.
 
 
 31
 Addressing the relationship element first, we initially find that the Countryside projects and the St. Alban's venture shared the common purpose of defrauding subcontractors. The results were similar; the subcontractors provided materials and labor without recompense. Likewise, the participants were identical, except that Stroth was substituted for CACC as the general contractor on the St. Alban's undertaking. The methodology employed was consistent in that DiCon loaned funds to an undercapitalized insider borrower, DiCon foreclosed when the borrower failed to pay, the subcontractors' liens were subordinate to DiCon's mortgage, and Conry, DiCon, and LMH thus gained the value of the subcontractors' work without remunerating them.
 
 
 32
 Guided by the Court's directive that continuity is "centrally a temporal concept," we first look to the length of time during which the conduct occurred. The construction of the Countryside homes took place from September 1982 until August 1983. The subcontractors began working on the St. Alban's residence in March 1984, and construction was completed in late 1985. Thus, the conduct lasted for over three years. This is "not sporadic activity," Sedima, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14, nor is it the type of conduct occurring "over a few weeks or months," H.J., Inc., --- U.S. at ----, 109 S.Ct. at 2902. We make no determination as to what period of time is necessary to fulfill the continuity requirement. We hold only that the conduct present here is sufficient. Even under Fulmer and its progeny, we believe two schemes existed, one at Countryside and the other at St. Alban's. "[P]roof that a RICO defendant has been involved in multiple criminal schemes [is] highly relevant to the inquiry into the continuity of the defendant's racketeering activity * * *." H.J., Inc., --- U.S. at ----, 109 S.Ct. at 2901. Adhering to the Supreme Court's flexible approach in determining continuity, we believe that other evidence is germane to this point. The periods of construction were wholly separate and distinct. Construction at St. Alban's did not begin until several months after work was completed at the Countryside lots. The schemes involved two different subdivisions. Different subcontractors, and thus different victims, were involved in the two projects. The conduct also involved a complex series of activities indicating continuity, such as the numerous corporate entities created by Anderson and Conry and the working and financing arrangements employed.
 
 
 33
 Finding that the appellants' acts exhibit both relationship and continuity, we, accordingly, conclude that a pattern of racketeering activity has been established.
 
 5. Enterprise Distinct from Person
 
 34
 Section 1962(c), which prohibits a "person" associated with an "enterprise" from participating in the affairs of the enterprise through a pattern of racketeering activity, has been interpreted as requiring that the person named as the defendant cannot also be the entity identified as the enterprise. See Bennett, 685 F.2d at 1061-62 (dismissing one count of plaintiff's complaint for failing to draw a distinction between the enterprise and the person named as the defendant). Here, Atlas and Olson alleged that the enterprise was an association in fact consisting of DiCon, LMH, AES, Stroth, and CACC. Two members, DiCon and LMH, were also persons named as defendants. The appellants contend that, because DiCon and LMH were members of the enterprise, Atlas and Olson have failed to demonstrate that there exists a person distinct from the enterprise. We disagree.
 
 
 35
 Here, the enterprise and the person are not identical, as the appellants assert. The enterprise in this case is an association in fact composed of five entities.[7] A collective entity is something more than the members of which it is comprised. If five persons form an association in fact and engage in a pattern of racketeering activity such as drug smuggling and murder, an individual member could never be prosecuted for violating RICO under the appellants' reasoning because he or she would not be considered distinct from the enterprise. We do not believe that Congress envisioned that this type of conduct would be insulated from RICO prosecutions. Other courts confronted with this issue have reached identical results. See, e.g., Perholtz, 842 F.2d at 353-54; Galerie Furstenberg v. Coffaro, 697 F.Supp. 1282, 1287-88 (S.D.N.Y.1988); Connors v. Lexington Ins. Co., 666 F.Supp. 434, 447-48 (E.D.N.Y.1987).
 
 
 36
 Thus, we find that Atlas and Olson have demonstrated that LMH and DiCon were distinct from the enterprise.
 
 
 37
 6. Enterprise Distinct from Racketeering Activity
 
 
 38
 "In order to secure a conviction under RICO, the Government must prove both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.' " Turkette, 452 U.S. at 583, 101 S.Ct. at 2528. "The existence of an enterprise at all times remains a separate element [from the pattern of racketeering activity] which must be proved * * *." Id. (footnote omitted). The existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." Id. In light of Turkette and the legislative history of RICO, this court has determined that a RICO enterprise must exhibit three basic characteristics: (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering. United States v. Kragness, 830 F.2d 842, 855 (8th Cir.1987) (citing United States v. Bledsoe, 674 F.2d 647, 664-65 (8th Cir.), cert. denied, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982); United States v. Lemm, 680 F.2d 1193, 1198 (8th Cir.1982),cert. denied, 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983)). These characteristics are mandated "in order to avoid the danger of guilt by association that arises because RICO does not require a proof of a single agreement as in a conspiracy case, and in order to ensure that criminal enterprises, which are RICO's target, are distinguished from individuals who associate for the commission of sporadic crime." Id. (citations omitted). The appellants argue that the third element is absent here. They contend that if the fraudulent housing projects at Countryside and St. Alban's are eliminated, an enterprise structure does not remain. We disagree.
 
 
 39
 Significantly, the enterprise here involved legitimate businesses. "Separating the enterprise from the pattern of racketeering is generally not problematic where a legal entity is involved, since 'this entity is likely to be clearly distinct from the acts of racketeering.' " Kragness, 830 F.2d at 855 n. 10 (quoting Bennett, 685 F.2d at 1060 n. 9). Putting the predicate acts of mail fraud aside, the evidence still shows that the enterprise had an on-going structure and that its members were not engaged in sporadic criminal activity. Here, the enterprise, its participants and their employees sold real estate, loaned money to develop properties, performed subcontracting work, and built single-family residences. See Kragness, 830 F.2d at 857-58 (stating that if the predicate acts of drug smuggling were put aside, the evidence still disclosed that the enterprise demonstrated an on-going structure, by purchasing property, acquiring planes, and renting airplane hangars); Lemm, 680 F.2d at 1201 (finding that if the predicate offenses of mail fraud were eliminated, the evidence still showed that an on-going structure engaged in legitimate purchases and repairs of property and illegal acts of arson). Thus, it has been demonstrated that the enterprise had "an organizational pattern or system of authority beyond what was necessary to perpetrate the predicate crimes." Bledsoe, 674 F.2d at 665.
 
 
 40
 We find that the enterprise involving LMH, DiCon, AES, Stroth, and CACC had a common or shared purpose, some continuity of structure and personnel, and an ascertainable structure distinct from that inherent in the conduct of the pattern of the racketeering activity. Thus, the enterprise was distinct from the pattern of racketeering activity.
 
 
 41
 Having determined that Atlas and Olson have demonstrated each element of section 1962(c), we accordingly conclude that the district court correctly denied the motion for judgment n.o.v.
 
 B. New Trial
 1. Evidence of Conspiracy
 
 42
 Conry asserts that the evidence was insufficient to prove that he conspired to violate RICO. Conry first argues that no RICO violation occurred. Furthermore, Conry contends that he did not enter into a criminal agreement with Anderson; rather, it was a legitimate business arrangement which encountered problems due to inexperience and misfortune.
 
 
 43
 "[W]e have recognized that the denial of a motion for a new trial asserting that the jury's verdict is against the weight of the evidence is 'virtually unassailable on appeal,' and is reviewed only for a showing of a clear abuse of discretion." Crowley Beverage Co. v. Miller Brewing Co., 862 F.2d 688, 690 (8th Cir.1988) (quoting Grogg v. Missouri Pac. R.R. Co., 841 F.2d 210, 214 (8th Cir.1988)). "In ruling upon a new trial motion, a district court may set aside a jury verdict if the court has determined that the verdict is against the clear weight of the evidence or that the granting of a new trial is necessary to prevent injustice." Id. (citation omitted). "RICO conspiracy law * * * requires only that each defendant agree to join the conspiracy, not that he agree to commit each of the acts that would achieve the conspiracy's objective." Kragness, 830 F.2d at 860. Circumstantial evidence demonstrated Conry's participation in the scheme to defraud.
 
 
 44
 Conry made a number of misrepresentations regarding CACC's and Stroth's ability to pay subcontractors and the source of the financing. LMH, which was solely owned and controlled by Conry, was the seller of the land in each case. DiCon, also controlled by Conry, provided the financing for each project. During the period of time herein involved, Anderson was employed by Conry's company, AES. From this, it can be inferred that Conry was intimately involved in the scheme to defraud subcontractors of their labor and materials and that Conry agreed that the necessary predicate acts would be committed. Accordingly, we find that the jury verdict was not against the clear weight of the evidence and that a new trial was not necessary to prevent injustice. Thus, we conclude the district court did not abuse its discretion in refusing to grant a new trial on this issue.
 
 2. Discovery Violations
 
 45
 The appellants next argue that Atlas's and Olson's counsel failed to timely disclose witnesses and exhibits and that the appellants were prejudiced thereby. The appellants contend that prejudice was shown because the inadequate disclosures precluded them from deposing the witnesses and examining the documents, resulting in insufficient trial preparation.
 
 
 46
 The grant or denial of a motion for a mistrial is committed to the sound discretion of the trial court. Davis v. American Jet Leasing, Inc., 864 F.2d 612, 614 (8th Cir.1988) (citation omitted). The scope of review concerning discovery matters is very narrow, and the trial court will not likely be faulted absent a gross abuse of discretion resulting in fundamental unfairness in the trial of the case. Id. (citation omitted).
 
 
 47
 Although certain witnesses were not disclosed, their employers were and the appellants were apprised that representatives of those companies would testify. After closely examining the record with respect to other witnesses belatedly revealed, it is evident that cross-examination was searching, the evidence was cumulative, or the testimony was not damaging. Additionally, appellants' counsel was provided the opportunity at trial to examine documents which were not disclosed in timely fashion. Finally, appellants' counsel declared during the course of the trial that the appellants were not sufficiently prejudiced to the extent that a mistrial was necessary. We, therefore, conclude that the trial court did not abuse its discretion by admitting testimony and exhibits not timely disclosed to opposing counsel.
 
 
 48
 Finding that the trial court did not abuse its discretion on either of the appellants' claims, we, therefore, conclude that the trial court correctly denied the appellants' motion for a new trial.
 
 III. CONCLUSION
 
 49
 We have carefully examined all other issues raised by the appellants and find them to be without merit. As earlier indicated, the appellants object to the award of attorney fees. However, they concede that reasonable fees are authorized by the RICO Act, 18 U.S.C. Sec. 1964(c) (1982), and do not seriously dispute the amount awarded should the appellees prevail in the RICO claim. For the foregoing reasons, the decision of the district court is affirmed.
 
 
 
 [1]
 The Honorable Donald D. Alsop, Chief Judge, United States District Court for the District of Minnesota
 
 
 [2]
 Although $140,000 was loaned for the purchase and improvement of each lot, the loan agreement also provided for interest and other charges. Thus, at the time DiCon brought a foreclosure action, its encumbrance on each property was well in excess of the amount of the original loan due to interest and other charges which had accrued
 
 
 [3]
 Section 1341 provides: "Whoever, having devised * * * any scheme or artifice to defraud, * * * for the purpose of executing such scheme or artifice * * *, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, * * * shall be fined * * * or imprisoned * * *." 18 U.S.C. Sec. 1341 (1982)
 
 
 [4]
 "The elements of fraudulent representation are: (1) there must be a representation; (2) that representation must be false; (3) it must have to do with a past or present fact; (4) that fact must be material; (5) it must be susceptible of knowledge; (6) the represent[o]r must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false; (7) the represent[o]r must intend to have the other person induced to act, or justified in acting upon it; (8) that person must be so induced to act or so justified in acting; (9) that person's action must be in reliance upon the representation; (10) that person must suffer damage; (11) that damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of the injury." Florenzano v. Olson, 387 N.W.2d 168, 174 n. 4 (Minn.1986) (citation omitted)
 
 
 [5]
 Rough-in is that stage of construction when the windows and doors are installed and the roof is completed
 
 
 [6]
 Atlas's and Olson's appraisal expert testified that the lot was worth $71,000. Nonetheless, Stroth paid $210,000 for the property. To the $210,000 was added construction financing of $140,000 plus interest and charges. Thus, at the time the house was completed, the amount of the mortgage was in excess of $400,000. Therefore, it was economically unfeasible for the subcontractors to redeem
 
 
 [7]
 This court has never determined whether corporations can form an association in fact under RICO. We now join other circuits in holding that corporations may be considered associations in fact for purposes of RICO. See, e.g., United States v. Perholtz, 842 F.2d 343, 353 (D.C.Cir.) (holding that individuals, corporations, and other entities may constitute an association in fact) (citations omitted), cert. denied, --- U.S. ----, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988). Although section 1961(4) provides that an enterprise includes any union or group of individuals associated in fact, the statute's language is illustrative, not exhaustive. Also, we think it unwise policy to permit individuals to escape the reach of RICO through the simple artifice of incorporating