UNITED STATES of America, Appellee,

v.

Ellis B. GOODMAN, Appellant.

UNITED STATES of America, Appellee,

v.

BEDFORD DIRECT MAIL
SERVICES, Appellant.

No. 92–2491.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 12, 1992.

Decided Jan. 15, 1993.

Rehearing Denied March 19, 1993.

James Wyrsch Kansas City, MO, argued (Michael P. Joyce, on the brief), for appellant.

Ellyn Grant, Omaha, NE, argued (Ronald D. Lahners, on the brief), for appellee.

Before FAGG, Circuit Judge, LAY, Senior Circuit Judge, and BOWMAN, Circuit Judge.

LAY, Senior Circuit Judge.

Ellis B. Goodman and Bedford Direct Mail Services, Inc. were convicted of ten counts of mail fraud in violation of 18 U.S.C. § 1341. On appeal, defendants contend that (1) the evidence was insufficient to support their conviction; (2) the district court erred in excluding certain evidence; (3) the district court erred in refusing to grant their motion for bill of particulars and in its jury instructions; and (4) a constructive amendment or variance occurred between the indictment and the proof at trial. Finding the evidence insufficient to prove a scheme to defraud under the mail fraud statute, 18 U.S.C. § 1341, we reverse and order the entry of judgments of acquittal.

I. BACKGROUND

Ellis B. Goodman (Goodman) was the owner and president of Bedford Direct Mail Services, Inc. (Bedford), a direct mail marketing company. In 1990, Goodman designed a Phone/Mail–A–Gram, which was sent to some 1.2 million people. On the front of the mailgram, in large block letters at the top, were the words "SPECIAL REPLY." On the top right side, the mailgram stated:

YOU ARE ELIGIBLE TO RECEIVE ONE OF THE FOLLOWING:

\_ ONE GIFT

X TWO GIFTS

\_ THREE GIFTS

On the left side, it read:

THIS PHONE/MAIL–A–GRAM IS A CONFIRMATION OF THE FOLLOWING MESSAGE /STOP/

CONGRATULATIONS: YOU ARE DEFINITELY TO RECEIVE ONE OR MORE OF THE GIFTS LISTED BELOW /STOP/

\* \* GIFT(S): (1) $5,000 CASH / (2) $2,500.00 CASH / (3) $1,000.00 DISCOUNT SHOPPING SPREE.

The \* \* before the word "Gift(s)" referenced a note on the bottom right to "SEE REVERSE SIDE FOR DETAILS."

On the reverse side of the mailgram was a paragraph in block print, explaining the odds of receiving each gift: *for $5,000, 1 in 300,000; for $2,500, 5 in 300,000; and for the discount shopping spree coupons, 1 in 1.* Below these odds, the mailgram indicated that the coupons could be used only toward the purchase of merchandise out of a catalog.

The mailgram stated that the offer would expire 48 hours from receipt and told the recipients to call immediately "to see which gift(s) you receive." It listed a "900" telephone number[1] and indicated that such a call would cost $3.98 plus 97 cents per minute, with a minimum three minute charge.[2] The mailgram also contained information on how to obtain "12 WEEK delivery" by returning the mailgram *by mail* to Bedford.

Of the 1.2 million mailgrams sent, 41,725 people called in response, and 35,239 discount shopping spree coupons were sent out. These discount coupons pertained to a promotion called the "Shopping Spree." Recipients of the coupons could use them to purchase one of fourteen items contained in the catalog, items ranging from bracelets and chef's knives to a mink coat. After applying the coupon to the total price, the price of these items still exceeded Bedford's cost in obtaining the items. However, an expert witness for defendants concluded that the mark-ups were "very fair, even on the low side." Some 230

---

1. With "900" numbers, the caller pays a lump fee. Part of that fee goes to the long distance carrier for services provided, and the remainder goes to the business setting up the "900" telephone number program (the sponsor). The billing rate is normally set by the sponsor.

2. The defendants received about 80% of the money from the "900" number. Transcript volume V, pp. 729–30. Bedford's accounting records indicated that Bedford earned a total amount of $530,914 on the 900 telephone number program from March 1990 through February 1991. Transcript volume V, pp. 841–42.

orders were placed from the Spree catalogs.

Some recipients of the mailgram mistakenly believed that they had already won *two* gifts—both the discount coupons as well as a cash prize. Defendants received 914 complaint letters, many protesting the fact that they did not receive this second gift. In response, the defendants sent a letter which explained that "[e]ach participant definitely receives one item, but they are always 'eligible' for two." The letter also explained how recipients of a second gift were selected. Each mailgram contained an identification number. Certain identification numbers had been preselected as the winning numbers. Thus, if one of the persons with a winning identification number happened to respond to the mailgram, that person was notified that he or she had won a cash prize. One $2,500 cash gift was in fact given away.

In its indictment, the government charged Goodman and Bedford with a scheme to defraud, whereby they—

> induced people to call a "900" number and incur telephone charges in the belief that they would thereby receive money and things of value when in truth and fact what they received was simply an opportunity to purchase one of fourteen items, the stated value of which was far in excess of their wholesale cost to Goodman and [Bedford], and for which they would be required to pay an amount that easily covered the cost to [Bedford] plus a profit.

Following a jury trial, Goodman and Bedford were convicted on ten counts of mail fraud.

## II. DISCUSSION

Goodman and Bedford contend that the evidence was insufficient to show that they committed mail fraud and, therefore, the district court erred in denying their motions for judgment of acquittal. In reviewing challenges to the sufficiency of the evidence, we must view the evidence in the light most favorable to the government and sustain the verdict if it is supported by substantial evidence. *United States v. Coronel–Quintana,* 752 F.2d 1284, 1292 (8th Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985).

To establish mail fraud, the government must prove the existence of a plan or scheme to defraud, that it was foreseeable that the scheme would cause the mails to be used, and that the use of the mails was for the purpose of carrying out the fraudulent scheme. *Atlas Pile Driving Co. v. DiCon Fin. Co.,* 886 F.2d 986, 991 (8th Cir.1989). At issue in this case is the first requirement—the existence of a scheme to defraud. We have stated that the "word 'scheme' connotes some degree of planning by the perpetrator, and thus it must be proved that a defendant acted with an intent to defraud." *DeMier v. United States,* 616 F.2d 366, 369 (8th Cir.1980). In *United States v. Brien,* 617 F.2d 299, 307 (1st Cir.), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980), the court observed that "[t]he essence of a scheme is a plan to deceive persons as to the substantial identity of the things they are to receive in exchange." A scheme to defraud need not be fraudulent on its face, but "must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1415 (3d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). These cases reflect the governing law applied by courts of appeals in defining a mail fraud scheme.

After reviewing the record, we must agree with defendants that the evidence, even when viewed in the light most favorable to the government, does not support a showing of a scheme to defraud. The mailgram contains statements which are literally true. The recipient is told to call a "900" number, but is advised that the call will result in a telephone charge at a specified rate. The recipient is further advised that he or she may respond by mail. Although the mailgram refers to "two" gifts, it clearly states that the recipient is merely "eligible" to receive two gifts and that "you are definitely to receive *one or*

*more* of the gifts listed below" (emphasis added). Moreover, the reader is directed to "See Reverse Side for Details," where the odds for winning the cash prizes are clearly indicated. Finally, the recipient is told that the discount coupons may be used only toward the purchase of merchandise out of defendants' catalog.

The government argues that the mailgram contains false statements. It contends that the word "gift" in connection with the discount shopping coupons is a false statement because the coupons have no inherent value. This argument suggests that coupons are not a gift unless the recipient views the coupon as valuable, by desiring to purchase the specified item. We disagree. Few coupons are redeemable for cash. Rather, the holder must purchase the specified item to receive the benefit of the coupon. Nonetheless, courts and legislatures have recognized that coupons have value. *See, e.g., Coldwell Banker Residential Real Estate Servs., Inc. v. Clayton,* 105 Ill.2d 389, 86 Ill.Dec. 322, 324–25, 475 N.E.2d 536, 538–39 (1985) (upon closing of house sale, Coldwell gave coupon booklet to home buyers, whereby buyer could purchase merchandise from Sears at discounted price; practice violated Ill.Rev.Stat. ch. 111, ¶ 5732(e)(20), which prohibits "[u]sing prizes, money, free gifts or other valuable consideration" in the solicitation of customers); *Coldwell Banker Residential Real Estate Servs., Inc. v. Missouri Real Estate Comm'n,* 712 S.W.2d 666, 667 (Mo.1986) (en banc) (same coupon booklet scheme described above was within Missouri Real Estate Commission's regulation on conditional inducements, which forbids using "prizes, money, gifts or other valuable consideration" as inducements to secure customers); Miss.Code Ann. § 31–7–23 (stating that "[a]ny rebates, refunds, coupons, merit points, gratuities or any article of value" given to an agency from a vendor inure to the benefit of the agency).

In addition, the government asserts that labelling the discount coupons as gifts is false because, even with the coupons, the recipient still paid more for the catalog items than defendants paid for those items wholesale. This argument confuses the issue of whether the *coupons* were gifts with the separate question of whether the catalog items were gifts. Clearly, the catalog items were not gifts,[3] because the coupon-holder had to pay for the items. However, the mailgram did not purport to give away catalog items, only coupons. As noted above, we believe that the coupons had value.

Even if the mailgram contains no affirmatively false statements, however, the government argues that there still may be a scheme to defraud because of what was *not* disclosed. It contends that the jury could reasonably find a scheme to defraud because the mailgram gave the false impression that the recipients had won a cash prize in addition to the discount coupons. For example, the government urges the words "one gift," "two gifts," and "three gifts" on the front of the mailgram created the impression that the recipients had already been selected to receive two gifts. Similarly, the same impression was created by having the information regarding the odds of winning each prize in a sentence format, instead of bulleted. To correct this impression, the government argues that defendants should have included *one* additional sentence in the mailgram, a sentence which read: "eligible means that each addressee is qualified to receive a cash award and could possibly receive a cash award *if* you respond and *if* your reference ID number matches one of those pre-selected to receive a cash award." Appellee's Brief at 19. If that sentence had been included, the government urges there would have been full disclosure and the defendants would not have been convicted of mail fraud.

We find this argument unpersuasive. The mailgram clearly states that the recipients are merely "eligible" to receive two gifts and are not "certain" to win a cash prize. The odds of receiving a cash prize are explicitly stated on the reverse side of the mailgram. These statements are plain-

---

**3.** A "gift" is defined as "a voluntary transfer of property to another made gratuitously and with- out consideration." Black's Law Dictionary 619 (5th ed. 1979).

ly presented and, as a matter of law, are not "reasonably calculated to deceive persons of ordinary prudence." *United States v. McNeive*, 536 F.2d 1245, 1249 n. 10 (8th Cir.1976).[4] The crux of the government's argument, therefore, is the semantical obliquity that had the word "qualified" been substituted for the word "eligible," defendants would have acted in "good faith" and there would have been no scheme to deceive. Criminal fraud cannot turn on semantical phrases, especially those which contain equivalent meanings.[5]

This court is well aware that there are coupon schemes which do violate criminal laws. In *Lemon v. United States*, 278 F.2d 369 (9th Cir.1960), the court affirmed the federal mail fraud convictions of defendants who solicited the orders of coupon booklets. There, defendants intentionally withheld information concerning conditions attached to many of the coupons. Moreover, the court found that the solicitations contained false representations as to value. *Id.* at 374. This cannot be said of the case at bar, where the coupon recipients were informed that the coupons only entitled them to purchase items from the defendants' catalog.

There exist countless coupon booklets and sweepstake offers, however, which do not violate criminal laws. The United States mails are continually flooded with sweepstake opportunities which are used to promote sales of magazines and books. For example, the Reader's Digest Sweepstakes asks recipients to "Please Open Immediately" and "Important you reply promptly!" It labels recipients as "eligible participant[s]" and requires the return of the eligibility card for a chance to win money prizes. Numerous other groups send flyers indicating that the addressee is the lucky recipient who might win millions in cash prizes.

■ The difference between the legal and illegal promotion is that the illegal scheme involves some affirmative misrepresentation or active concealment manifesting an intent to deceive. *See United States v. McNeive*, 536 F.2d 1245, 1251 (8th Cir.1976) (finding mail fraud conviction improper in absence of material misrepresentation or active concealment); *United States v. Pintar*, 630 F.2d 1270, 1280 & n. 12 (8th Cir.1980) (same); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir.1991) (scheme to defraud must involve "some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension"). It is true that the crime of mail fraud has been called "broad in scope,"[6] but this does not mean that its net is so large as to catch all promotions that make money.[7] Many shrewd advertising schemes are concocted to persuade the consumer into purchasing products of questionable worth. However, in all cases where mail fraud convictions have been affirmed, the government has proven a scheme which failed to reflect "fundamental honesty, fair play and right dealing in the general and business life of members of society." *Blachly v. United States*, 380

---

4. Indeed, the testimony at trial shows that those responding to the mailgram understood that they had not necessarily won a cash prize. For example, one witness testified that "maybe my luck had changed.... maybe I was eligible or would receive two gifts." Another witness stated that the odds language meant "that for certain I would definitely get item three, gift three, because of the odds being one in one. I understood the others as telling me I might be, I might fall into the class of items one or two." A third witness indicated that he recognized "the odds were low for winning the five thousand dollars or the twenty-five hundred dollar prize."

5. Webster's Third New International Dictionary (1981) defines "eligible" as "fitted or qualified to be chosen or used; worthy to be chosen or selected."

6. *See, e.g., Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 991 (8th Cir.1989); *Blachly v. United States*, 380 F.2d 665, 671 (5th Cir.1967).

7. This circuit has noted that this "broad construction" language does not change the fact that courts must not extend § 1341 to punish conduct beyond that which Congress intended, and that the general rule that "penal statutes are to be strictly construed" still applies. *See United States v. McNeive*, 536 F.2d 1245, 1247–50 & n. 3, 1252 (8th Cir.1976). *See also McNally v. United States*, 483 U.S. 350, 360, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987) ("[B]efore one can be punished [for mail fraud], it must be shown that his case is plainly within the statute").

F.2d 665, 671 (5th Cir.1967); *see also Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 991 (8th Cir.1989). The schemes were proven to be illegal by evidence of affirmative misrepresentations or by evidence of nondisclosure manifesting an intent to defraud. *See, e.g., United States v. Urban*, 746 F.2d 1345, 1346 (8th Cir.1984) (despite knowledge that company failed to obtain loans, defendant continually misrepresented that company was in fact successfully procuring loans); *Lemon v. United States*, 278 F.2d 369, 373–74 (9th Cir.1960) (solicitors misrepresented value of items and failed to disclose conditions attached to coupons); *United States v. Bush*, 522 F.2d 641, 648–49 (7th Cir.1975) (defendant failed to disclose interest in advertising agency and misrepresented that relationship to the mayor); *United States v. Bishop*, 825 F.2d 1278, 1280 (8th Cir.1987) (defendants misrepresented value and number of cattle sold). Without some objective evidence demonstrating a scheme to defraud, all promotional schemes to make money, even if "sleazy" or "shrewd," would be subject to prosecution on the mere whim of the prosecutor. More is required under our criminal law.

Perhaps the naive and gullible consumer needs more protection from the wily promoter than the sophisticated customer. *See Lemon v. United States*, 278 F.2d 369, 373 (9th Cir.1960). But in today's society, criminal prosecution cannot be used to punish those who run promotional schemes to make money simply because some persons are more susceptible to try their luck than a more prudent recipient of the mail. If purchase by the naive and imprudent consumer be the test to prosecute promoters, most state and charitable lotteries, as well as promotions using 900 numbers to solicit "lonely hearts," could be criminally liable.

By this opinion, we do not suggest that states may not use their unfair business practices laws or other laws to enjoin or otherwise find such operations civilly liable.[8] *See, e.g., People v. Toomey*, 157 Cal. App.3d 1, 203 Cal.Rptr. 642 (1984). We are concerned with applying *criminal* sanctions to punish persons involved in promotions to make money which simply do not rise to the requisite level of fraudulent deception.

In conclusion, we cannot discern how the mailgram used by the defendants constitutes a scheme to defraud when in essence it accurately and fully explains the costs the recipient will incur and identifies the property or monies the recipient is eligible to receive. Although the "scheme" may have induced many naive people to respond hoping to be a lucky winner, there is no evidence of intentional misrepresentations and no evidence of any material nondisclosure. Under these circumstances we hold that the convictions must be reversed.

Because we conclude that the evidence was insufficient as a matter of law to prove a scheme to defraud, we need not address defendants' remaining arguments. For the foregoing reasons, we vacate the convictions of Ellis B. Goodman and Bedford Direct Mail Services, Inc. and remand to the district court with instructions to enter judgments of acquittal.

FAGG, Circuit Judge, dissenting.

I dissent. In my view, the district court correctly submitted the mail fraud charges against Goodman and Bedford to the jury. Although the court's opinion makes clear that judges would not be fooled by the likes of Goodman and Bedford, I believe the court's assessment of the record misses the mark in the real world where schemers

---

**8.** In fact, the Commonwealth of Pennsylvania charged Bedford and Goodman with violating its unfair trade practices and consumer protection laws. In lieu of proceeding to trial, defendants signed a consent petition for permanent injunction and paid penalties and costs to the Commonwealth. In addition, the United States brought a civil fraud action against Bedford and Goodman; defendants agreed to a preliminary injunction and also agreed to allow MCI to hold some $200,000 owing them. Although the particulars are unclear, it appears that the government and defendants have attempted to work out a restitution proposal with that amount.

The issue in these civil actions often involves whether the promotion used unfair methods of competition or deceptive advertising. Absent some affirmative misrepresentation or nondisclosure, however, even promotions which may be "misleading" for purposes of civil liability do not rise to the level of criminal mail fraud.

like Goodman and Bedford prey on ordinary people they deem ripe for plucking. I would hold the evidence presented at trial, coupled with reasonable inferences that may be drawn from it, supports the jury's verdicts.